**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| CSX TRANSPORTATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEN'S FOODS, INC. <br><br> Defendant. | Civil Action No. <br> 1:16-CV-10115-RWZ |

**DEFENDANT KEN'S FOODS, INC.'S
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Introduction

1. The dispute between the parties centers over liability for 68 outstanding CSX freight invoices for shipments of tomato paste occurring between July 2014 and March 2015. (*See generally*, Exhibit 7[1] (*CSX Transportation, Inc. v. Ken's Foods, Inc.*, Civil Action No. 1:16-cv-10115-RWZ, Complaint (1/26/16) (D. Mass.) at [Dkt. 1] (herein after, "Complaint")); Exhibit 12 (CSXT_1025-1044); Exhibit 13 (CSXT_0001-02); Exhibit 2 (B. Cabay Trans. 5/23/2017, 31:6-21); Exhibit 1 (R. Fearrington Trans. 8/1/2017, 61, 63:20-64:4).)

The Parties

2. Ken's contracted with DSA to serve as its broker and/or third-party logistics provider for purposes of arranging for the transportation of tomato paste from California to Massachusetts. (Exhibit 7 (Complaint, ¶ 12); Exhibit 14 (KENS000001-3); Exhibit 15

---

[1] All Exhibit references are to Exhibits to the Affidavit of Lawrence Green, Esq., submitted herewith.

(KENS001108-10); Exhibit 16 (KENS000054-58); Exhibit 17 (KENS000059-61); Exhibit 18 (CSXT_0548); Exhibit 2 (B. Cabay Trans. 5/23/2017, 42:4-7, 43:23-44:17); Exhibit 4 (N. Petri Trans. 3/29/2017, 29:4-8, 30:18-20).)

3. Ken's had no agreement with CSX for transportation of the freight. (Affidavit of Marie Johnson, ¶ 2-3.)

4. The relevant tomato paste suppliers were Los Gatos and Morning Star. (Exhibit 11 (CSX's Response to Ken's Interrogatory No. 13-14); Exhibit 19 (KENS000077-80); Exhibit 20 (KENS000073-76); Exhibit 21 (KENS000086-89).)

5. DSA used CSX as a carrier for this freight. (Complaint, ¶ 6, 9.)

The DSA-CSX Credit Arrangement

6. Neither CSX nor DSA produced any credit agreement between the parties, despite that it was requested as part of discovery by Ken's. (Affidavit of Lawrence Green, Esq., ¶ 32; *see also* Exhibit 2 (B. Cabay Trans. 5/23/2017, 40:6-8 (CSX's 30(b)(6) witness had not seen one.)).)

7. According to the CSX manager of credit litigation in 2014-2015, Ms. Fearrington, there would have had to have been some separate agreement for credit between the parties other than a standard rate agreement tariff or circular. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 8:20-23, 9:7-9, 19:11-20:8).)

8. DSA had a 15 day credit arrangement with CSX. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 34:25-35:8, 40:18-23, 41:2-8); Exhibit 4 (N. Petri Trans. 3/29/2017, 46:16-21, 57:14-20).)

9. CSX claims that the 15 day credit arrangement is based upon the applicable tariff(s) and/or circular(s) published by Union Pacific and CSX Transportation. (Exhibit 22 (CSXT_0912-25 (UP 203, Item: 1100-1Y PASTE)); Exhibit 23 (CSXT_0926-39 (UP 203, Item: 1100-JM PASTE)); Exhibit 24 (CSXT_0940-1020 (UP Rules Circular 4-F)); Exhibit 25 (CSXT_1045-1102 (Publication CSXT 8100, July 2014)); Exhibit 26 (CSXT_1103-1162 (Publication CSXT 8100, January 2015)); Exhibit 3 (R. Yarlott Trans. 6/25/2017, 34:12-24, 41:2-8); Exhibit 2 (B. Cabay Trans. 5/23/2017, 36:17-21); Exhibit 11 (CSX's Response to Ken's Interrogatory No. 8).)

10. At least some of the relevant Los Gatos bills of lading were not marked prepaid, collect, or third party. (*See* Exhibit 5 (B. Clement Trans. 5/15/2017, 13:11-14:6, 28:10-18, Ex. 3 at CSXT_004).)

11. The Union Pacific Railroad Bills of Lading list the "Party to Receive Freight Bill" as "DSA Management Inc." (*See, e.g.*, Exhibit 5 (B. Clement Trans. 5/15/2017, 13:11-14:6, Ex. 3 at CSXT_007).)

<u>The Charges</u>

12. The amount of the freight charges is $701,301.00. (*See generally*, Exhibit 7 (Complaint); Exhibit 12 (CSXT_1025-1044); Exhibit 13 (CSXT_0001-02); Exhibit 2 (B. Cabay Trans. 5/23/2017, 31:6-21).)

13. $701,301.00 is roughly equal to the amount of money that DSA should have paid to CSX over the course of a year. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 47:10-17).)

14. It was a "good-sized," "substantial" balance. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 73:22); Exhibit 4 (N. Petri Trans. 3/29/2017, 70:4-9).) It accumulated over the course of several years. (Exhibit 4 (N. Petri Trans. 3/29/2017, 60:2-9, 70:10-13).)

15.     Ken's paid DSA in full for the freight charges at issue.  (Affidavit of Marie Johnson, ¶ 4.)

16.     But DSA failed to pay CSX.  (Exhibit 7 (Complaint, ¶ 14).)

### The 30(b)(6) Fiction

17.     CSX finally designated Brad Cabay as its 30(b)(6) designee more than two months after Ken's served CSX with a 30(b)(6) notice. [Dkt. 28, 29.] Ken's served CSX with a 30(b)(6) notice on February 1, 2017. *Id.* CSX originally designated two individuals—Ed Berlin and Robert Yarlott—on February 22, but in an about-face, on March 2, CSX withdrew those names.  *Id.*  It took until May 5 for CSX to designate Mr. Cabay, which CSX only did after Ken's filed a Motion to Compel.  *Id.*

18.     Mr. Cabay is currently manager of accounts receivable at CSX.  (Exhibit 2 (B. Cabay Trans. 5/23/2017, 13:5-14).)

19.     During the relevant time frame (2014-2015), Mr. Cabay was a logistics analyst at CSX, and he had no role in monitoring accounts receivable.  (Exhibit 2 (B. Cabay Trans. 5/23/2017, 10:18-24).)

20.     During the relevant time frame, Mr. Cabay had no responsibilities whatsoever as to DSA, and he was not familiar with DSA.  (Exhibit 2 (B. Cabay Trans. 5/23/2017, 10:25-11:5).)

21.     Mr. Cabay's name does not appear on a single document produced by any party (or non-party) to this action, nor does it appear in any discovery responses.  (Affidavit of Lawrence Green, Esq., ¶ 33.)

22.     Brad Cabay suggested that the continued extension of credit by CSX to DSA was in the ordinary course.  (Exhibit 2 (B. Cabay Trans. 5/23/2017, 64:3-8; 83:5-84:5).)

<u>The Reality</u>

23.     Because Mr. Cabay had no personal knowledge, Ken's also took the depositions of former CSX employees Robert Yarlott, Ed Berlin, and R. Kay Fearrington. (Affidavit of Lawrence Green, Esq., ¶ 33.) Mr. Yarlott was manager of international sales from July 2014 to March 2015. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 10:25-11:2).) Mr. Berlin was manager of accounts receivable during that time frame. (Exhibit 6 (E. Berlin Trans. 5/26/2017, 10:23-12:8).) During 2014 until her retirement in April 2015, Ms. Fearrington was the manager of credit litigation. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 8:18-9:9).)

24.     CSX's practice was to "escalate" customers who were behind on payments. These escalations consisted of collections letters, cash holds, and suspensions or revocation of credit. (*See, e.g.*, Exhibit 27 (CSXT_0342-44); Exhibit 4 (N. Petri Trans. 3/29/2017, 67:20-68:6).)

25.     CSX apparently made escalation decisions on a case-by-case basis for each customer. (Exhibit 6 (E. Berlin Trans. 5/26/2017, 30:9-12); Exhibit 2 (B. Cabay Trans. 5/23/2017, 83:6-16).) The decision to suspend a credit agreement is made on a case-by-case basis. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 51:17-24, 54:13-15).)

26.     DSA had no regularly set meetings with CSX to discuss its credit. (Exhibit 4 (N. Petri Trans. 3/29/2017, 65:4-6).)

27.     Sales personnel (like Mr. Yarlott) and accounts receivable personnel (like Mr. Berlin) were apparently separate from personnel in the CSX collections department and personnel in the CSX credit department (like Ms. Fearrington), who ultimately made the decision on whether to revoke credit arrangements. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 60:17-22); Exhibit 1 (R. Fearrington Trans. 8/1/2017, 26:11-27:18, 51:7-53:13, 58:9-15).) It would be up to

the credit manager and the finance group to decide whether to revoke credit and actually do so. (Exhibit 6 (E. Berlin Trans. 5/26/2017, 42:14-20; 44:23-45:15).)

28. There was a lot of turn over at CSX during the 2014-2015 timeframe, including in the credit department. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 18:13-16, 52:16-53:3); Exhibit 6 (E. Berlin Trans. 5/26/2017, 36:25-37:15, 42:21-43:7).)

29. Ms. Fearrington retired in July 2015, and Mr. Berlin began taking over her role in April/May 2015. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 8:18-8:23, 15:18-23); Exhibit 6 (E. Berlin Trans. 5/26/2017, 11:3-12:11, 26:21-27:3).)

30. Mr. Yarlott took over management of the DSA account in March 2015. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 20:7-9).) Prior to Mr. Yarlott, Brian Dowd managed the DSA account at CSX. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 20:10-12, 20:24-21:6).)

31. DSA did not know who its contact person at CSX was. (Exhibit 4 (N. Petri Trans. 3/29/2017, 71:15-72:11).)

32. Mr. Yarlott never told Mr. Petri that he was taking over the DSA account, and Mr. Yarlott did not know how Mr. Petri was supposed to know who at CSX was handling the DSA account. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 28:25-29:11).)

33. Mr. Yarlott did not have access to DSA's credit information with CSX, but he could have requested it though he "failed to see the relevance." (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 36:22-37:21).)

34. Mr. Yarlott did have access to DSA's accounts receivable aging, but does not recall ever looking at it. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 37:15-21).)

35. It was not the regular practice for marketing folks to let the credit department know when marketing was following up regarding an outstanding balance. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 56:19-57:8).)

36. CSX had no policies or procedures governing unpaid customer invoices, other than "commonsense." (Exhibit 2 (B. Cabay Trans. 5/23/2017, 28:2-16, 29:4-13); Exhibit 3 (R. Yarlott Trans. 6/25/2017, 48:25-49:9, 49:17-50:9).)

37. CSX dealt with its customer's unpaid invoices on a case-by-case basis. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 28:12-13, 29:20-30:4); Exhibit 3 (R. Yarlott Trans. 6/25/2017, 50:5-9).)

38. On December 17, 2014, Mr. Dowd (of CSX) emailed Mr. Petri (of DSA) stating: "I was advised that CSXT suspended its credit agreement with DSA effective today due to outstanding freight invoices. The account balance is $794,000." (Exhibit 18 (CSXT_0548).)

39. In February 2015, CSX apparently had DSA on "cash hold." (Exhibit 27 (CSXT_0342-44).) An internal CSX email dated February 18, 2015 states:

> Revenue Services confirmed all cars are on a cash hold which means payment of freight is required before cars are placed at the industry. Distribution Services of America has a substantial balance and according to Revenue Services invoices are paid "very slowly. They are aware of the balance; however, they only pay 1 or 2 here and there to release cars on cash hold as they need them."

(Exhibit 28 (CSXT_0349-52 at CSXT_0350).)

40. Another internal CSX email dated February 18, 2015 states that DSA has a "$385,623 balance" and "is in the cash customer collection team." Some of the invoices relating to this balance "are dated November 2014." By contrast, the balance in the subject line is shown as "$874k." (Exhibit 29 (CSXT_0336-38).)

7

41. These cars were taken off cash hold later that day. (Exhibit 28 (CSXT_0349-52 at CSXT_0349).)

42. At the same time, some DSA cars could be on cash hold, while others were not. (Exhibit 1 (R. Fearrington Trans. 8/1/2017, 37:23-38:15).)

43. At the same time, a CSX customer could have invoices in special collections and others that were not. (Exhibit 6 (E. Berlin Trans. 5/26/2017, 39:8-16); Exhibit 1 (R. Fearrington Trans. 8/1/2017, 44:12-46:25).)

44. Although Mr. Yarlott considered himself responsible for monitoring the DSA account starting in March 2015, he thinks there must have been someone else who was responsible for it; he just doesn't know who, in part due to the division of authority at CSX. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 45:12-47:5).) Mr. Yarlott presumed that CSX's accounts receivable group was responsible for monitoring DSA's accounts receivable. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 44:3-6).)

45. Mr. Yarlott did not have any regular interval with which he checked DSA's account balance. He was "frankly, trying to, at the time, engage with a number of other customers where issues were more pressing in terms of business development . . ." (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 63:8-21).)

46. Mr. Yarlott's April 10, 2015 email to Petri was the first communication Mr. Yarlott had with Mr. Petri, and it was only done in response to an email from Mr. Petri. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 62:22-24, Ex. 10 at CSXT_0549).)

47. Mr. Yarlott states: "When I made a cursory check, I found to my dismay that we've got $712,999 in unpaid freight charges all older than ninety days (see attached breakdown of the invoices). With CSX credit terms requiring payment on a net-15 basis, I've got no hope of

getting the support of the finance team for such a write-off." (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 61:15-62:14, Ex. 10 at CSXT_0549).)

48. Mr. Yarlott did not tell anyone in CSX's credit administration group that he was in communication with DSA. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 65:6-17).)

49. On December 10, 2015, Mr. Yarlott states,

> … As you are probably aware, the current outstanding CSXT unpaid invoices for Distribution Svc of America come to $748,429.08 including invoices from August of 2014 (now more than a year old) and finance charges of $12,696.08.
>
> This is a bad situation that has not changed (actually it is a good bit worse) since I became aware of it in April (see attached). It cannot continue and needs to be resolved immediately.

(Exhibit 30 (Dec. 10, 2015 Email Chain between R. Yarlott and N. Petri).) Mr. Petri responds to this email saying, "Robert, I don't know if you're aware that these invoices have gone to collections/court." (*Id.*)

50. "I don't need someone to explain to me that a customer that's not paying their bill shouldn't be offered credit." (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 47:24-48:2).)

51. Mr. Yarlott was surprised that CSX let it go on so long. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 48:19-21).)

52. "Incompetence or inattentiveness or perhaps a procedural lapse" resulted in DSA's unpaid balance accumulating at CSX. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 64:7-14).)

53. Over his 20-some years at CSX, Mr. Yarlott dealt with around three customers that had a balance of roughly the same size as CSX. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 47:3-13).)

54. "I personally would not have sent an account of that magnitude to a collection agency . . ." (Exhibit 6 (E. Berlin Trans. 5/26/2017, 35:3-17).)

55. DSA had a delinquent balance of several hundred thousand dollars at least between March 2015 and January 2016. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 71:9-13).)

56. If DSA paid the finance charge for the unpaid balances, CSX backed off and did not communicate with DSA. (Exhibit 4 (N. Petri Trans. 3/29/2017, 47:20-48:19).)

57. CSX could have refused to transport the freight because it had not been prepaid. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 38:18-39:2); Exhibit 2 (B. Cabay Trans. 5/23/2017, 76:10-24).)

58. CSX could have embargoed the receiver, DSA, meaning that CSX could have refused to accept freight for that customer or advised other carriers not to bill freight to that receiver. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 39:3-20); Exhibit 2 (B. Cabay Trans. 5/23/2017, 76:10-24, 82:21-83:4).)

59. CSX made the conscious decision to keep shipping to DSA even though the prior shipments were unpaid for. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 86:14-20).) It was a calculated risk. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 92:8-25).)

The Tariffs and Circulars

60. Union Pacific's "UP 203, Item: 1100-IY, Paste" is the tariff that covers movements of tomato paste in drums or wooden/plastic bins. (Exhibit 22 (CSXT_0912-0925, at CSXT_0912).) UP Rules Circular 4-F is part of that tariff. (*See* Exhibit 24 (CSXT_0940).)

61. UP-4F, Item 111 states: "The liability of consignor, consignee and beneficial owner of shipment for charges arising out of this offer and its acceptance, through tender of shipment by consignor and through acceptance of delivery by consignee, is joint and several except as provided in Section 7 of Item 25." (Exhibit 24 (CSXT_0940-1020, at CSXT_0968.))

62. UP-4F, Item 25-A, Section 7(e) gives the destination carrier the right to refuse to relinquish possession until freight charges are paid: "On shipments which were not prepaid, the destination carrier shall have the right to refuse to relinquish possession of the property moved under this bill of lading until freight and all other accrued charges have been paid." (Exhibit 24 (CSXT_0940-1020, at CSXT_0959).)

63. UP-4F, Item 25-A, Section 7(d) allowed the carrier to require prepayment or guarantee for freight charges. (Exhibit 24 (CSXT_0940-1020, at CSXT_0959).)

<u>CSX's Failure to Alert Ken's</u>

64. Mr. Yarlott never had any communication with anyone at Ken's. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 70:7-11).) Neither did Mr. Berlin (Exhibit 6 (E. Berlin Trans. 5/26/2017, 22:6-10)), nor Ms. Fearrington (Exhibit 1 (R. Fearrington Trans. 8/1/2017 16:4-6)). No one at CSX did. (Affidavit of Marie Johnson, ¶ 5.)

65. CSX's accounts receivable team had to clear the decision to file a lawsuit against Ken's by CSX's marketing/sales team. (Exhibit 6 (E. Berlin Trans. 5/26/2017, 14:20-15:5, 28:8-17, 29:3-23).)

66. DSA sent an email saying that it was closing as of January 4, 2016. (Exhibit 3 (R. Yarlott Trans. 6/25/2017, 68:17-69:13, Ex. 13 at CSXT_0555-56).) This was the first time that DSA told Ken's about its financial difficulties. (Exhibit 4 (N. Petri Trans. 3/29/2017, 93:16-23).) No one at DSA told Ken's about DSA's ongoing delinquency or the escalations. (Exhibit 4 (N. Petri Trans. 3/29/2017, 61:11-13, 63:1-8, 75:10-17; 76:10-12; 76:15-19, 79:2-4, 83:3-5; 86:16-87:2, 94:17-19).)

67. No one at CSX told Ken's about DSA's ongoing delinquency or the escalations. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 76:25-77:7); Exhibit 1 (R. Fearrington Trans. 8/1/2017, 51:3-6, 55:11-14).)

68. Ken's is a direct customer of CSX's for other purposes, so CSX had the contact information for Ken's, but it chose not to contact Ken's regarding the DSA delinquency. (Exhibit 2 (B. Cabay Trans. 5/23/2017, 79:23-80:5).)

### The DSA Litigation

69. CSX first sued DSA on May 12, 2015. Ken's was not named as a defendant in said action. (Exhibit 8 (*CSX Transportation, Inc. v. DSA-Management, Inc. f/k/a Distribution Services of America, Inc.*, Civil Action No. 1:15-cv-11831-FDS, Complaint (05/12/15) (D. Mass.) at [Dkt. 1]); Exhibit 11 (CSX's Response to Ken's Interrogatory No. 9).)

70. Ken's was not notified of DSA's delinquency with CSX until CSX issued a subpoena to Ken's as part of the CSX v. DSA litigation. (Exhibit 9 (11/19/15 Letter and Subpoena to Ken's Foods, Inc. issued by CSX in *CSX Transportation, Inc. v. DSA-Management, Inc.*); Exhibit 11 (CSX's Response to Ken's Interrogatory Nos. 9-10).)

71. After DSA filed for bankruptcy on January 11, 2016, CSX filed the present lawsuit against Ken's on January 26, 2016. (Exhibit 10 (*CSX Transportation, Inc. v. DSA-Management, Inc. f/k/a Distribution Services of America, Inc.*, Civil Action No. 1:15-cv-11831-FDS, Notice of Bankruptcy (1/11/16) (D. Mass.) at [Dkt. 25]); Exhibit 8 (Complaint); Exhibit 11 (CSX's Response to Ken's Interrogatory No. 8).) At no prior time had CSX attempted to collect any of the delinquent charges from Ken's. (*See* Affidavit of Marie Johnson, ¶ 6; Exhibit 2 (B. Cabay Trans. 5/23/2017, 80:6-9); Exhibit 11 (CSX's Response to Ken's Interrogatory Nos. 9-10).)

72.   CSX has not made any attempts to collect payment from the suppliers Los Gatos and Morning Star.  (Exhibit 11 (CSX's Response to Ken's Interrogatory No. 13-14).)

73.   CSX failed to file a notice of claim in the DSA bankruptcy.  (*See generally In re DSA Management Inc.*, Case No. 1:16-bk-10055.)

## Conclusion

74.   CSX's treatment of DSA was out of the ordinary course.  (*See* SOF ¶¶ 23-59.) "Incompetence or inattentiveness" contributed to the enormous balance accumulating. (*See* SOF ¶ 52.)

75.   CSX had the ability to cut off its business with DSA at any time.  (*See* SOF ¶¶ 57, 58, 62.)

76.   Neither CSX nor DSA alerted Ken's of the situation until years after the fact. (*See* SOF ¶¶ 64, 66, 67, 70, 71.)

Dated: September 29, 2017

Respectfully submitted,

KEN'S FOODS, INC.
By its attorneys,

*/s/ Lawrence G. Green*
Lawrence G. Green, BBO #209060
lgreen@burnslev.com
Laura Lee Mittelman, BBO #689752
lmittelman@burnslev.com
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Tel. 617-345-3000
Fax 617-345-3299

**CERTIFICATE OF SERVICE**

      I hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 29, 2017.

                                      ___*/s/ Laura Lee Mittelman*_____
                                      Laura Lee Mittelman