UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10115-RWZ

CSX TRANSPORTATION, INC.

v.

KEN'S FOODS, INC.

MEMORANDUM OF DECISION AND ORDER

April 19, 2018

ZOBEL, S.D.J.

Plaintiff CSX Transportation, Inc., an interstate rail carrier, brings this action against defendant Ken's Foods, Inc. to collect outstanding freight charges for 68 shipments of tomato paste between July 2014 and March 2015. Both parties contend that no genuine issue of material fact exists and have filed cross-motions for summary judgment on liability (Docket ## 35, 41). Plaintiff additionally seeks summary judgment as to damages (Docket # 41) and also moves to strike portions of the Affidavit of Marie Johnson in Support of Ken's Foods' summary judgment motion (Docket # 53).

**I.    Factual Background**[1]

Defendant purchased tomato paste from suppliers in California as one of the roughly 800 ingredients used to produce its salad dressings and other products. It contracted with Distribution Services of America ("DSA") to provide various services

---

[1] The facts are derived from the parties' Statements of Undisputed Facts and responses thereto (Docket ## 49, 58) and all documents filed therewith.

related to railroad shipments of the tomato paste.  DSA's responsibilities included receiving and reviewing defendant's rail transportation invoices, after which defendant would pay DSA for the invoices and DSA would pay the railroad.[2]

For the 68 shipments involved in this case, defendant paid DSA for the freight charges billed by plaintiff, the rail carrier.  DSA, however, failed to pay plaintiff.  Plaintiff sued DSA on May 12, 2015 to recover the unpaid amounts, and DSA filed for bankruptcy in January 2016.  Plaintiff then sought to recover the unpaid charges from defendant, filing this suit on January 26, 2016.

It is undisputed that defendant was not notified about DSA's failure to pay the outstanding freight until November 2015 when plaintiff served a subpoena on defendant during the CSX/DSA litigation.  By that point, nearly 16 months had passed since the first unpaid shipment.  However, defendant was not completely ignorant of problems between plaintiff and DSA.  For instance, DSA met with defendant "at least usually once a year" and at some point informed defendant that plaintiff was assessing finance charges for late payments.[3]  Docket # 44-3 at 150.  Nevertheless, defendant never asked DSA to verify paying the freight charges.  In fact, defendant never conducted any due diligence or evaluated DSA's financial condition at any point during the companies' 17-plus year relationship.

---

[2] In addition to these duties, "Ken's Foods relied on DSA to verify the shipping instructions for each shipment, track the shipment in route, inspect the containers of tomato paste when they arrived at Foxboro Terminals, inventory the supply of tomato paste stored at Foxboro Terminals, and submit any necessary freight loss and damage claims to the railroads for Ken's Foods." Docket # 49 ¶ 55.  Foxboro Terminals is a warehouse in Foxboro, MA where defendant stores its inventory of tomato paste and where such products are stored until needed at defendant's facility in Marlborough, MA.

[3] It is unclear from the testimony of Norman Petri, DSA's former CEO and president, on what exact date defendant was first made aware of these late payments and finance charges.  Docket # 44-3 at 148.

### A. Relevant Contracts and Documents

Determining liability in this case requires analyzing several contracts and documents pertaining to the tomato shipments, including (I) defendant's rate quotation agreement with DSA; (ii) the purchase orders defendant issued to its paste suppliers and the suppliers' invoices; (iii) the suppliers' and railroad's bills of lading for the shipments; and (iv) the UP203-1100 pricing tariff and Union Pacific's "General Rules Circular." I briefly describe each document/document category below.

#### 1. Defendant's Agreement with DSA

On July 1, 2014, defendant and DSA entered into a rate quotation agreement for the paste shipments which specified how the tomato paste would be transported, including that the shipments should be sent "freight collect"; that they should travel on Union Pacific's rail lines from California and switch to CSX's lines in Chicago ("UP-CHICAGO; CSXT"); and that the consignee for the shipments should be listed as "DSA For Ken's Foods":

| | |
|---|---|
| Consignee Address: | DSA For Ken's Foods<br>c/o Foxboro Terminals<br>208 North Street<br>Foxboro, MA 02035 |
| Freight Charges: | Ship freight collect |
| Quote: | UP 203-1100 |
| Routing: | UP-CHICAGO; CSXT |

Docket # 38–14 at 3. As discussed below, defendant's purchase orders, its suppliers' invoices, and the shipments' bills of lading are generally consistent with this information for the 68 shipments in this case.

#### 2. Defendant's Purchase Orders and the Suppliers' Invoices

When defendant purchased tomato paste, it generated purchase orders to one of two suppliers: Los Gatos Tomato Products ("Los Gatos") and The Morning Star Packing Co. ("Morning Star"). The suppliers then issued invoices to defendant.

Three of the relevant shipments contained Morning Star tomato paste. For example, on July 28, 2014, defendant purchased tomato paste from Morning Star and generated a purchase order therefor. According to the purchase order, the shipment was to be paid "freight collect" and shipped to "Foxboro Terminal, 208 North Street, Routing UP-CHGO-CSXT, Foxboro, MA 02035." Docket # 44–16 at 3. Morning Star's invoice for this order lists the billing address as "Ken's Foods, 1 De Angelo [sic] Drive, Marlborough, MA," and the shipping address as "DSA for Ken's Foods c/o Foxboro Terminals." Docket # 44–18 at 2.[4]

Sixty-five of the relevant shipments contained Los Gatos tomato paste. For instance, on September 22, 2014, defendant purchased tomato paste from Los Gatos using a purchase order numbered 135035. Docket # 44–16 at 3. As above, the purchase order states that payment is "freight collect." Id. at 2. It identifies the "ship to" address as "Ken's Foods, Inc. 1 D'Angelo Drive, Marlborough, MA." Id. Los Gatos's invoice for this order identifies "Ken's Foods, Inc." as the recipient of the shipment and specifies delivery terms as "FOB Huron." Docket # 44–17 at 2.

### 3. The Bills of Lading

---

[4] In addition, a separate sales agreement between Morning Star and defendant provides the delivery terms for the shipments as: "FOB Morning Star plant, CA, U.S.A." Docket # 60–2 at 2. "The phrase 'F.O.B.' stands for 'free on board' and generally describes a sale in which the seller assumes all costs and responsibilities up to a specific point of delivery. In an F.O.B. transaction, the buyer acquires title to the goods and assumes the risk of loss once the products have been delivered to the F.O.B. location." Congress Credit Corp. v. Fronex Commodities, Inc., 1997 WL 588911, at *5 (D.P.R. Sept. 18, 1997) (citations omitted).

As the shippers/consignors, both Morning Star and Los Gatos generated straight uniform bills of lading for the paste shipments. Morning Star's bill of lading for the July 28, 2014 purchase order, for example, identifies in relevant part: (1) the consignee's address as "DSA for Ken's Foods c/o Foxboro Terminals 208 North Street, Foxboro, MA 02035"; (2) the "Contract Ref[erence]" as "Ken's Foods Marlborough MA"; and (3) that the shipment would be paid "collect." Docket # 44–20 at 2. The bill of lading further states that "every service to be performed hereunder shall be subject to all the bill of lading terms and conditions in the governing classification on the date of shipment." Id. Los Gatos's bill of lading for the September 22, 2014 shipment includes information similar to that on Morning Star's, such as identifying: (1) "Ken's Foods, Inc." as the consignee and (2) "Ken's Foods, Inc. c/o Foxboro Terminals 208 North Street, Foxboro, MA" as the shipping address. Docket # 44-19 at 2. And like the Morning Star bill, the Los Gatos bill of lading also states that it is "subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading." Id.

Finally, origin rail carrier Union Pacific Railroad ("UP") also issued bills of lading for the above-referenced shipments containing similar information: (1) Foxboro, MA as the rail destination; (2)"CC (Collect)" as the method of payment; (3) UP203-1100 as the pricing tariff information; and (4) "DSA for Ken's Foods" as the consignee. Docket # 44–21 at 2-3.

### 4. The UP203-1100 Tariff and UP's General Rules Circular

As noted above, defendant's contract with DSA and the UP bills of lading both reference "UP203-1100" as the "rate authority" or "quote" that set the price for the paste shipments. The parties agree that UP203-1100 is the UP tariff item covering

5

movements of tomato paste in drums or wooden/plastic bins (just like the shipments in this case).  Docket ## 38–22 at 2, 38–23 at 2.[5]  Though defendant disputes that the shipments were in fact subject to UP203-1100, it is undisputed that, if they were so subject, then the shipments' terms necessarily incorporate UP's "General Rules Circular."[6]  Docket # 49 ¶ 50 and Response.

Several provisions of the Circular are relevant here. First, Exempt Circular UP 4-F, Item 111, "Liability of Consignee & Consignor" states:

> The <u>liability of consignor, consignee and beneficial owner of shipment for charges</u> arising out of this offer and its acceptance, through tender of shipment by consignor and through acceptance of delivery by consignee, <u>is joint and several</u> except as provided in Section 7 of Item 25.

Docket # 38–24 at 30 (emphasis added).  Second, Section 7 of Item 25, "Terms and Conditions," provides:

> (a) All freight and other charges are payable by the shipper, consignor, consignee or beneficial owner immediately upon delivery.  <u>Acceptance by the consignee or beneficial owner of the property herein described shall be deemed acceptance by consignee or beneficial owner of responsibility for freight and other charges</u> accruing on said property.

---

[5]   UP203, Item 1100-IY issued on March 12, 2014 and was effective from March 15, 2014 through March 14, 2015.  <u>See</u> Docket # 38-22.  UP203, Item 1100-JM issued on February 9, 2015 and was effective August 15, 2014 through March 14, 2015.  <u>See</u> Docket # 38-23.  The "General Application Rules" for these two tariffs are the same.

[6]   This incorporation-by-reference is set forth in the tariff's "General Application Rules," which specify that the price "is subject to Exempt Circular UP4 (series)."  <u>Id.</u>  In turn, Exempt Circular UP 4-F, Item 7-A, "General Explanation," states:

> This circular sets forth terms and conditions under which the carrier(s) party hereto will provide transportation services for a shipper.  <u>The provisions of this circular shall be incorporated in a contract of carriage (bill of lading or shipping order) executed by shipper and carrier(s) party hereto for any transportation hereunder</u>, and shall also be incorporated in all certificates, receipts, and other documents described within this circular.

Docket # 38-24 at 11 (emphasis added).

6

Id. at 20 (emphasis added).  And finally, Item 120, "Suit to Collect Charges," states:

> In the event that suit must be filed to collect any charge or charges subject to the provisions of this publication, <u>the amount sued upon shall include interest from the date of shipment</u> at the maximum rate of interest allowed by law in the jurisdiction in which it is filed.  <u>Court costs and reasonable attorney's fees shall be added</u> to such principal and interest.

Id. at 34 (emphasis added).

## II.  Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Ferguson v. Gen. Star Indem. Co., 582 F. Supp. 2d 91, 98 (D. Mass. 2008) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)).  "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Id. (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197–98 (D. Mass. 1991)).

## III.  Analysis

The parties have filed cross-motions for summary judgment on the issue of liability. Plaintiff also moves for summary judgment on damages.

### A. Defendant's Motion for Summary Judgment

Defendant contends that it is entitled to summary judgment because it is not contractually liable under the shipping documents, applicable tariffs and/or circulars. Alternatively, even if it is liable, defendant argues that plaintiff is barred from collecting the outstanding freight charges under the doctrine of equitable estoppel.

#### 1. Contractual Liability

Defendant maintains that (i) it was not a party to the bills of lading because it was not the named consignee, and thus cannot be held liable for the freight charges; and (ii) even if it is party to the contracts, the bills of lading do not impose liability because they do not incorporate a specific UP tariff and/or circular and "[n]othing in the Ken's-DSA contracts, the Ken's-Los Gatos contracts, or the Ken's-Morning Star contracts refers to UP and/or CSX services, tariffs or circulars." Docket # 48 at 2. I address each argument in turn.

##### I. Defendant's Liability as Consignee

A bill of lading "serves both as a receipt and as a contract." Louisville & N.R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 67 (1924). The default presumption is that the shipper, as the consignor, pays the freight charges. Id. However, this "pattern and presumption can be overcome by statute, by contractual provisions, or by the parties' course of conduct." EIMSKIP v. Atlantic Fish Market, Inc., 417 F.3d 72, 77 (1st Cir. 2005) (citing Louisville & N.R. Co., 265 U.S. at 67–68). When a bill of lading is marked "collect," the consignee is liable for freight charges. Oak Harbor Freight Lines v. Sears

Roebuck & Co., 420 F. Supp. 2d 1138, 1148 (W.D. Wash. 2006); see also Lee v. Arrowpac, Inc., 179 B.R. 10, 13 (D.P.R. 1995) ("A stamp of 'collect freight' on a bill of lading signifies that the consignee has assumed responsibility for payment [of the freight charges], whereas 'freight is prepaid' signifies that the shipper will pay the freight charges.") (citations omitted).  Here, it is undisputed that the bills of lading were marked "freight collect."[7]  Thus, the consignee is liable for the freight charges.

Defendant argues, however, that it is not the consignee because the UP and Morning Star bills of lading identify "DSA for Ken's Foods, Inc." as the consignee.  Thus, it argues, "[i]n the face of such ambiguity on the bills of lading, Ken's cannot be liable under the theory that it is the named consignee."  Docket # 48 at 4.

Defendant's position is unpersuasive.  The only reasonable reading of these bills is that defendant was the consignee of the shipments.  See Adria, 241 F.3d at 111 ("If the agreement is ambiguous, a court may still grant summary judgment as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations.").   Although the UP Bills of Lading reference "DSA," they state "DSA for Ken's Foods, Inc."  See Louisiana Transp. v. Cowan Systems, LLC, No. 11-cv-3435, 2012 WL 1664120, at *1 (D.N.J. May 10, 2012) (carrier was instructed by a third party acting "on behalf of" ultimate recipient of cargo, and therefore the recipient was the consignee and/or beneficial owner of the cargo).  This nomenclature simply reflects that

---

[7] Although defendant attempts to create an issue of material fact by stating that "[a]t least some of the relevant Los Gatos bills of lading were not marked prepaid, collect, or third party," Docket # 58, at ¶ 10, it has not provided any contradictory evidence in the record to show that any bills of lading were marked prepaid.  Further, the UP Bills of Lading, which were generated after the consignors had submitted their bills of lading, were indeed marked "collect."  See Docket # 44–21 ("Your bill has been received by Union Pacific Railroad").  Even more, defendant agreed to payment "collect" in its own contract with DSA.  Docket # 44–23.  Thus, there is no genuine dispute as to whether the shipments were "collect" moves.

defendant hired DSA to do a job, i.e. to "verify the shipping instructions for each shipment, track the shipment in route, inspect the containers of tomato paste when they arrived at Foxboro Terminals, inventory the supply of tomato paste stored at Foxboro Terminals, and submit any necessary freight loss and damage claims to the railroads for Ken's Foods." Docket # 49 ¶ 55. Furthermore, defendant agrees that DSA received the shipments in Foxboro for the benefit of defendant, and that defendant was the ultimate user of the product. Accordingly, the record supports only one reasonable interpretation: defendant was the consignee and DSA was its service provider or "freight forwarder." See Docket # 52–5 at 2 (DSA Application for Credit and Agreement with CSX describing the nature of its business as "Freight Forwarder"); see also United States v. Zhen Zhou Wu, 711 F.3d 1, 9 (1st Cir. 2013) ("A 'freight forwarder' is 'a transportation broker who assembles and consolidates numerous small shipments into one large load, arranges for long-haul transportation of the consolidated shipment, breaks the consolidated load into small individual shipments, and delivers those packages to the ultimate consignees." (quoting Regular Common Carrier Conference v. United States, 793 F.2d 376, 378 (D.C. Cir. 1986)).

### ii.   UP203 and the UP's General Rules Circular

In addition to defendant's liability as consignee of these "collect" shipments, the UP Rules Circular further reinforces defendant's obligation to pay the freight charges. Those Rules—which apply to any shipment using UP tariff UP203-1110—explicitly provide that the consignor, consignee, and beneficial owner are jointly and severally liable for the freight charges. Furthermore, the Rules clearly state that "acceptance by the consignee or beneficial owner of the property ... shall be deemed acceptance ... of

responsibility for freight and other charges ...." See Docket # 38–24 at 20.  Both of these provisions support finding defendant liable for the freight charges, either as consignee or, alternatively, as the undisputed beneficial owner of the tomato paste.

Defendant contends that the Rules don't apply because the shipments' bills of lading did not incorporate UP203-1110 and/or the UP Rules Circular.  It notes that the Morning Star and Los Gatos bills of lading do not explicitly reference UP203, and it contends that "[n]othing in the Ken's-DSA contracts, the Ken's-Los Gatos contracts, or the Ken's-Morning Star contracts refers to UP and/or CSX services, tariffs or circulars." Docket # 48, at 2.

These arguments miss the mark for several reasons.  First, while the Morning Star and Los Gatos bills of lading do not explicitly reference a pricing authority, both state that they are subject to "tariffs in effect on the date of the issue of this Bill of Lading."  Docket ## 44–19 at 2, 44–20 at 2.  It is undisputed that UP203 is the applicable UP tariff covering movements of tomato paste such as the shipments in this case.  Second, apart from the suppliers' bills, the UP bills of lading expressly note that the rate authority is "UP" or "UP203" and the "contract #" is "1100" or "2031100." Docket # 44–21.  Third, defendant's own rate quotation agreement with DSA also explicitly references UP2031100 as the quoted rate.  These facts entirely undermine defendant's argument that the shipments were not subject to the UP tariff.  Because the undisputed facts show that the tariff did cover the 68 shipments, this provides an alternative basis for holding defendant liable for the freight charges.

**2.     Equitable Estoppel**

Even if it is found liable, defendant argues that plaintiff is estopped from

collecting on the unpaid freight charges. To prevail, defendant bears the burden of showing "1) a material misrepresentation by [plaintiff]; 2) reasonable reliance thereon ...; and 3) disadvantage resulting therefrom." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir. 1989). Defendant notes that it paid DSA in full for the freight charges and was not notified about DSA's failure to pay plaintiff until over a year from the date of the shipments. Defendant therefore argues that plaintiff's failure to apprise it of DSA's growing delinquency was a misrepresentation by conduct that lulled it into a false state of security and should preclude plaintiff's recovery in this case.

Several appellate courts have confronted equitable estoppel defenses in this "double payment" context. The majority view is that equitable estoppel does not bar a carrier from collecting freight charges when the party responsible under the bill of lading chooses to remit payment through a third party who then absconds with the funds. See Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co., 513 F.3d 949, 959 (9th Cir. 2008); Hawkspere Shipping Co. v. Intamex, S.A., 330 F.3d 225, 237–38 (4th Cir. 2003); Nat'l Shipping Co. of Saudi Arabia v. Omni Lines, Inc., 106 F.3d 1544, 1546–47 (11th Cir. 1997); Strachan Shipping Co. v. Dresser Indus., Inc., 701 F.2d 483, 489–90 (5th Cir. 1983).[8] As a matter of policy and recognizing the "economic reality" of the shipping industry, these courts have imposed a form of "semi-strict liability" under which,

---

[8] While Hawkspere, Omni, and Strachan each involved a shipper/consignor's equitable estoppel defense, the analysis in those cases applies with equal force to a consignee's defense. That is confirmed by the Oak Harbor case, in which the Ninth Circuit followed Hawkspere, Omni, and Strachan in denying the equitable estoppel argument of a party who was consignor of some disputed shipments and consignee of others. See Oak Harbor, 513 F.3d at 959. It is further confirmed by the Southern District of Florida's decision in Spedag Americas, Inc. v. Petters Hospitality & Entertainment Group, LLC, in which the court noted that "the same logic" of those cases "applies to allocation of risk in the parallel 'innocent consignee' context." No. 07-80576-CIV, 2008 WL 3889551, at *6 (S.D. Fla. Aug. 18, 2008).

notwithstanding any freight payments made to a third party, the company liable under the bill of lading is not discharged from its obligation to pay unless the carrier has "actually released" it from its duty to do so.  The gist of these cases is that when a company chooses to pay freight charges via a third party, it "assumes the risk that the [third party] might not forward the freight payment to the carrier." Hawkspere, 330 F.3d at 238.

A few courts, by contrast, have carved out a narrow space for equitable estoppel where a carrier misleads the party to be charged into believing that the freight charges have been paid.  See, e.g., Olson Distributing Systems v. Glasurit Am., 850 F.2d 295, 297 (6th Cir. 1988); Consol. Freightways Corp. of Del. v. Admiral Corp., 442 F.2d 56, 58 (7th Cir. 1971).  These cases take the more lenient view that equitable estoppel may bar a carrier's recovery in the limited circumstance where "the carrier was held to have represented satisfaction of its freight charges upon which the consignee reasonably relied ...." Consol. Freightways, 442 F.2d at 59.  As the Supreme Court noted in Southern Pacific Transportation Co. v. Commercial Metals Co., the most common misrepresentation in these cases is "a false assertion of prepayment on the bill of lading."  456 U.S. 336, 351 (1982); see, e.g., Olson, 850 F.2d at 297; Consol. Freightways, 442 F.2d at 56.  According to these decisions, equitable estoppel is justified in such circumstances because, when a bill of lading is marked "prepaid," there is no reason for a "double check" by the party who would otherwise be liable under the bill.  Consol. Freightways, 442 F.2d at 56.  Thus, that party might right reasonably rely upon the representation of payment and conclude that its obligations had been relieved.

While the application of equitable estoppel in these circumstances appears to be

an issue of first impression in this circuit, I needn't resolve the divergent caselaw to conclude that defendant's defense fails. First, under the majority position, the defense is simply not available to defendant under the theory that, by hiring DSA and choosing to remit payment through it, defendant assumed the risk that DSA might fail to pay plaintiff. See Spedag Americas, Inc. v. Petters Hospitality & Entertainment Group LLC, No. 07-cv-80576, 2008 WL 3889551, at *6 (S.D. Fl. Aug. 18, 2008) (rejecting defendant's equitable estoppel defense and holding that "an owner/consignee which chooses to remit payment by way of a freight forwarder rather than directly to the freight carrier, assumes the risk that the forwarder might not forward the freight payment to the carrier"); see also Oak Harbor, 513 F.3d at 959 ("The bills of lading clearly were marked 'collect,' which put [defendant] on notice that payment was due. In addition, [defendant] undertook no actions to limit its liability. In particular, [defendant] could have elected to pay [the carrier] directly, but did not, and thereby assumed the risk that [the third-party] would fail to forward payment."). The summary judgment record is clear that defendant hired DSA and that plaintiff never "actually released" defendant from its liability for the freight charges as consignee and/or beneficial owner of the tomato paste shipments.

Second, even if I were to adopt the more lenient minority position under which equitable estoppel might apply, the record is clear that plaintiff made no material misrepresentations upon which defendant relied to its detriment. See K-Mart, 875 F.2d at 912. As noted above, the most common material misrepresentation in the equitable estoppel cases is a bill of lading marked "prepaid." Here, however, it is undisputed that none of the bills of lading for the 68 at-issue shipments were so marked; instead, they were to be paid "freight collect," i.e. by the consignee. That fact alone sets this case

apart from the typical equitable estoppel decisions.

Defendant argues that plaintiff's failure to inform it of DSA's delinquency was a "misrepresentation by conduct" that should suffice for equitable estoppel, but that pushes the doctrine too far. While plaintiff's failure to promptly alert defendant to DSA's delinquent payments might reflect poor business practices, it does not amount to deceptive behavior evidencing plaintiff's intent to mislead defendant. Cf. ANR Freight Sys., Inc. v. Weldbend Corp., No. 90 C 1948, 1993 WL 88086, at *5 (N.D. Ill. Mar. 22, 1993) (finding that carrier was estopped from collecting freight charges against defendant shipper because carrier had "with full knowledge" chosen to not inform defendant of broker's delinquent payments after being warned by broker that doing so would "significantly diminish[] [the carrier's] chances of collecting"). Moreover, though defendant portrays itself as an "innocent consignee," it bears repeating that defendant hired DSA, knew that DSA at times had trouble making timely payments to plaintiff, and yet never inquired of DSA as to whether it was dutifully paying its freight charges.

For these reasons, I find that defendant's equitable estoppel defense fails based on the law and the undisputed facts of this case. Defendant's motion for summary judgment is therefore denied.

### 3. Defendant's Request to Amend its Answer

Defendant has requested leave to amend its answer to add the affirmative defense of failure to mitigate in the event that this court denies its equitable estoppel defense and finds it liable for freight charges. Though "[a] court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), "[t]his rule does not mean that 'a trial court must mindlessly grant every request for leave to amend ....'" Manning

v. Boston Med. Ctr. Corp., 725 F.3d 34, 60–61 (1st Cir. 2013) (quoting Aponte–Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006)).  Instead, leave to amend is appropriately denied when, inter alia, "the request is characterized by 'undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part.'" Calderón–Serra v. Wilmington Trust Co., 715 F.3d 14, 19 (1st Cir. 2013) (quoting Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006)).  Here, I find that defendant's request must be denied.

    First, the request is unduly delayed.  Defendant raised the issue for the first time in the final paragraphs of its opposition to plaintiff's motion for summary judgment.  See Docket # 48 at 8-9.  Fact discovery had been closed for over four months by that time and summary judgment briefing was nearly complete.  Second, the request evinces a lack of due diligence on the part of the defendant.  Defendant does not point to newly discovered facts or any other legitimate excuse for this late shift in strategy.  Rather, its stated reason for requesting leave to amend is "to conform to a case relied on by CSX in its summary judgment papers."  Docket # 48.  But that decision is nearly ten years old, and plaintiff's citation to it does not justify this late request to amend.  Finally, though defendant suggests that "there will be no prejudice to CSX" if the court permits amendment, Docket # 48 at 9, plaintiff vigorously disagrees.  See Docket # 54 at 6 n.6.  Rather, plaintiff notes that it never had an opportunity to develop facts to oppose this defense, including regarding "industry standards and the reasonableness of CSX's efforts."  Id.

    For these reasons, defendant's request for leave to amend is denied.  See Resolution Tr. Corp. v. Gold, 30 F.3d 251, 254 (1st Cir. 1994) (affirming denial of

motion for leave to amend "proffered at the eleventh hour to fend off summary judgment"); E.E.O.C. v. Morgan Stanley & Co., 211 F.R.D. 225, 227 (S.D.N.Y. 2002) (denying leave to amend to add failure to mitigate defense where defenses "ha[d] long been available" and additional discovery required by new defenses "could cause unnecessary prejudice and delay").

### B. Plaintiff's Motion for Summary Judgment

As discussed above, defendant is liable to plaintiff for the freight charges in the amount of $728,917, and the summary judgment record shows that defendant's equitable estoppel defense fails.[9] Plaintiff's motion for summary judgment is therefore allowed as to defendant's liability for the 68 shipments.

Plaintiff has also argued that defendant should pay interest on that balance plus attorneys' fees and costs as provided by the UP Rules Circular (which applies to these shipments, as I determined above). The UP Rules Circular clearly provides for the award of such interest, costs, and fees, and defendant has not argued otherwise. I am therefore persuaded that plaintiff is entitled to this relief.[10] However, since the court cannot ascertain the appropriate amount of interest, costs, and fees to award based on the current record, I defer ruling on that issue pending further guidance from the

---

[9] Defendant fails to show a material dispute of fact regarding the total amount of the unpaid freight charges. Plaintiff contends that the total principal amount is $728,917, Docket # 49, at ¶ 71, whereas defendant argues that the total amount is $701,301, Docket # 58, at ¶ 12. However, Exhibit 13, which defendant cites to in support of its position, appears to be a spreadsheet of the 68 shipments showing that the total balance of unpaid freight charges, less the incidental finance charges, is $728,917. Thus, this amount is not seriously disputed.

[10] Nonetheless, although plaintiff is entitled to the relief it claims, the result of this litigation falls harshly on defendant, and the court urges the parties to resolve at least this last issue with grace.

parties.[11]

## IV. Conclusion

Defendant Ken's Foods, Inc.'s Motion for Summary Judgment (Docket # 35) is DENIED.  Plaintiff CSX Transportation, Inc.'s Motion for Summary Judgment (Docket # 41) is ALLOWED IN PART.  Defendant's request to amend its answer to add an affirmative defense regarding plaintiff's failure to mitigate damages (Docket # 48) is DENIED.  Plaintiff's Motion to Strike Affidavit of Marie Johnson in Part (Docket # 53) is DENIED.

A status conference is scheduled for May 16, 2018, at 3:00 p.m.

    April 19, 2018                                    /s/Rya W. Zobel
          DATE                                                    RYA W. ZOBEL
                                                                 SENIOR UNITED STATES DISTRICT JUDGE

---

[11] As to interest, Item 120 of the UP Rules Circular provides for prejudgment interest "from the date of shipment" and "at the maximum rate of interest allowed by law in the jurisdiction in which the suit is filed." Docket # 38–24 at 34. Relying on this provision, plaintiff asserts that "$399.41 in interest charges accrue daily on the unpaid Freight Charges" based on a purported "maximum legal [interest] rate in Massachusetts" of twenty percent annually. Docket # 42 at 18 (citing Mass. Gen. Laws ch. 271, § 49). There are multiple problems with this argument. First, this suit was filed in federal court and plaintiff asserts a federal cause of action. It is therefore unclear why Massachusetts law is the "law in the jurisdiction in which the suit is filed" in this case. Second, even if Massachusetts law did apply, it is unclear why the "maximum rate of interest allowed by law" should be 20% as set by the usury statute cited by plaintiff and not 12% as allowed by Mass. Gen. Laws ch. 231, § 6C, the statute specifically concerning prejudgment interest in contract actions such as this one. These deficiencies make it currently impossible for the court to determine the appropriate amount of prejudgment interest to be assessed on the freight charges.